J-A18032-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AL-TARIQ SHARIF ALI BYRD, A/K/A | : | No. 1817 WDA 2016 |
| JAMES T. BYRD | : | |
| | : | |

Appeal from the Order Entered October 31, 2016
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0002875-2015

BEFORE:  BOWES, J., LAZARUS, J., and OTT, J.

MEMORANDUM BY OTT, J.:                    FILED MARCH 26, 2018

The Commonwealth appeals[1] from the orders entered October 31, 2016, in the Court of Common Pleas of Allegheny County, granting, in part, and denying, in part, Al-Tariq Sharif Ali Byrd, a/k/a James T. Byrd's motion to suppress.  The Commonwealth claims the trial court erred in finding that:  (1) certain jail visitation recordings were made in violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("the Wiretap Act")[2] and the two-party consent exception did not apply; and (2) the warrantless search

_____

[1]  The Commonwealth has certified in its notice of appeal that the suppression order will terminate or substantially handicap its prosecution of the case.  See Pa.R.A.P. 311(d).

[2]  18 Pa.C.S. § 5701, et seq.

of Byrd's vehicle was not within the parameters of the Pennsylvania Supreme Court's newly recognized vehicle exception.[3]   After a thorough review of the submissions by the parties, the certified record, and relevant law, we reverse the court's suppression of the jail visitation recordings and certain evidence (the 20 bags of heroin, lockbox, vest, and cell phone) seized from Byrd's vehicle, and remand for further proceedings.

The trial court set forth the factual history as follows:

> The uncontradicted evidence presented at the suppression hearing established that on February 23, 2015 at approximately 6:00 p.m., Officer Ross Weimer of the McKeesport Police Department was dispatched to 807 Leech Street for a call of a female receiving threatening calls with a suspect parked outside the residence in a grey F-150 truck.  When Officer Weimer arrived at the residence, he noted a grey F-150 truck parked a few houses away.  Upon entering the residence, he spoke to Ms. Velez, who told him that a man known to her as "Reek" had threatened to kill her, had a gun and was parked outside her house.  Ms. Velez pointed out the grey truck previously referenced.  Officer Weimer approached the truck, which initially drove directly at him but did stop on command.  The driver, later identified as [Byrd], initially opened the window 2-3 inches and eventually opened it all the way.  Officer Weimer detected a strong odor of marijuana through the open window.  Officer Weimer described [Byrd] as acting in a nervous manner with shaking hands and rapid breathing and called for back-up.  When Officer Krejdovsky arrived, Officer Weimer asked [Byrd] to exit the vehicle and although he eventually opened the door, [Byrd] refused to get out.  Officer Weimer pulled him out of the truck and a struggle ensued during which Officer Krejdovsky slipped on some ice and fell down a small hill.  [Byrd] continued to struggle with Office[r] Weimer and was eventually able to break free after shedding his coat and shirt.

_____

[3]  The Commonwealth filed an appeal in an unrelated matter with respect to Byrd at Docket No. 1818 WDA 2016.  In that appeal, the Commonwealth raised only the issue regarding the Wiretap Act.  The trial court addressed both cases in its January 12, 2017, opinion.

[Byrd] ran and Officer Weimer chased him and attempted to use his taser, but he missed [Byrd]. [Byrd] eventually slipped on some ice near Officer Weimer's police vehicle and suffered a seizure while on the ground. Medics were called to attend to [Byrd]. Officer Krejdovsky testified that he observed a gun magazine under a piece of cloth on the front seat of the truck and he lifted the cloth to discover a .40 caliber handgun.

Also introduced into evidence was a stipulation that 20 stamp bags of heroin were found in an unlocked lockbox on the passenger seat of the vehicle, a bulletproof vest was found in the back seat of the vehicle and two (2) cell phones and a scale were also found in the vehicle (their location was not specified). Also stipulated to was that upon his arrest, 44 individually wrapped bags of marijuana, 10 individually wrapped bags of powder cocaine, four (4) bags of crack cocaine and $205.00 were found in [Byrd]'s pockets. The Commonwealth did not present any evidence regarding how the search of the truck was effectuated, but rather argued that it was appropriate due to the automobile exception to the search warrant requirement or, alternately, a search incident to arrest.

Trial Court Opinion, 1/12/2017, at 3-4 (footnote omitted).

Byrd was charged with persons not to possess firearms, carrying a firearm without a license, three counts of possession with intent to deliver, and three counts of possession of controlled substance.[4] Byrd filed a motion to suppress on February 10, 2016, in which he alleged the stop and subsequent search was unreasonable, illegal, and violated his constitutional rights. He filed an amended suppression motion on May 18, 2016, requesting the court exclude further evidence related to the search of his person.

_____

[4] 18 Pa.C.S. §§ 6105(a)(1) and 6106(a)(1), and 35 P.S. §§ 780-113(a)(30) and (a)(16), respectively.

- 3 -

Subsequently, the Commonwealth notified Byrd of its intent to present certain evidence against him that was obtained as a result of recording his conversations with visitors at the Allegheny County Jail.[5] Byrd filed a second amended motion to suppress on October 11, 2016, arguing these jail recordings violated his constitutional rights and the Wiretap Act. A hearing was held on October 31, 2016.[6] That same day, the court entered two orders: (1) granting Byrd's suppression motion as to the 20 bags of heroin, lockbox, vests, and two cell phones that were found in the vehicle, but denying his request as to remaining evidence seized from the vehicle; and (2) granting Byrd's motion to suppress all recordings of his jail visits. The Commonwealth filed a motion to reconsider, which was denied November 29, 2016. This appeal followed.[7]

_____

[5] Specifically, the Commonwealth sought to admit the following: (1) a partial transcript of a recording from a jail visit on August 14, 2015, in which Byrd made statements referencing his possession of a firearm; and (2) a recording of a jail visit from March 25, 2016 wherein Byrd and a visitor, Brandi Wilson, discussed Byrd's possession of body armor due to previously having been shot. See Byrd's Second Amended Motion to Suppress Pursuant to Pa.R.Crim.P. 581, 10/11/2016, at 3.

[6] At the hearing, the court addressed the jail visitation recordings as they relate to this matter and the matter at Docket No. 1818 WDA 2016.

[7] On December 6, 2016, the trial court ordered the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The Commonwealth filed a concise statement on December 14, 2016 The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on January 12, 2017.

In its first issue, the Commonwealth contends the trial court erred in rejecting its argument that Byrd's jail visit recordings "were permitted under the two-party consent exception to the Wiretap Act, finding the Commonwealth failed to prove that [Byrd] heard the recording warning which was played each time an inmate used the phone system to talk to a visitor." Commonwealth's Brief at 15.

Our standard of review of a trial court's order granting a defendant/appellee's motion to suppress evidence is well established:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts. Commonwealth v. Miller, 2012 PA Super 251, 56 A.3d 1276, 1278-79 (Pa. Super. 2012) (citations omitted). "Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain de novo review over the suppression court's legal conclusions." Commonwealth v. Brown, 606 Pa. 198, 996 A.2d 473, 476 (2010) (citation omitted).

Commonwealth v. Korn, 139 A.3d 249, 252-253 (Pa. Super. 2016), appeal denied, 159 A.3d 933 (Pa. 2016). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." Commonwealth v. Elmobdy, 823 A.2d 180, 183 (Pa. Super. 2003) (citations

omitted), appeal denied, 847 A.2d 58 (Pa. 2004). Nevertheless, the suppression court's conclusions of law are not binding on an appellate court, and are subject to plenary review. Commonwealth v. Johnson, 969 A.2d 565, 567 (Pa. Super. 2009) (citations omitted).

Generally, the Wiretap Act "prohibits the interception, disclosure or use of any wire, electronic or oral communication." Commonwealth v. Deck, 954 A.2d 603, 607 (Pa. Super. 2008), citing 18 Pa.C.S. § 5703, appeal denied, 964 A.2d 1 (Pa. 2009).[8] 18 Pa.C.S. § 5704 identifies "exceptions to Section 5703's prohibitions and allows for the interception of a wire, electronic or oral communication in designated circumstances." Deck, 954 A.2d at 607.[9] Pertinent to this case, Subsection 5404(4) states: "It shall not be unlawful and no prior court approval shall be required under this chapter for . . . [a] person, to intercept a wire, electronic or oral communication, where all parties

_____

[8] An "oral communication" is defined as follows: "Any oral communication uttered by a person possessing an expectation that such communication is not subject to interception under circumstances justifying such expectation. The term does not include any electronic communication." 18 Pa.C.S. § 5702.

[9] The parties originally disputed whether the recordings fell within the county correctional facility telephone call exception to the Wiretap Act. See 18 Pa.C.S. § 5704(14); Trial Court Opinion, 1/12/2017, at 11. However, at the suppression hearing, the Commonwealth conceded that the telephone jail visit system was not a "telephone," and therefore, Subsection 5704(14) did not apply. See N.T., 10/31/2016, at 38; see also Commonwealth v. Fant, 146 A.3d 1254, 1265 (Pa. 2016) (holding inmate visit conversations using a telephone device "are not 'telephone calls,' and they are not subject to the county correctional facility 'telephone' exception under the Wiretap Act.")

to the communication have given prior consent to such interception." 18 Pa.C.S. § 5704(4).

Turning to the present matter, the Commonwealth states:

Inmates and visitors at the Allegheny County Jail are notified that their conversations may be monitored or recorded immediately prior to each visit conversation. By engaging in a conversation after receiving notice that the conversation may be monitored or recorded, the participants consent to the interception. Each of the conversations at issue in the instant case carried the warning that the conversation could be monitored or recorded. As such, visit recordings comply with the Wiretap Act, and any incriminating statements obtained from these recordings are admissible as evidence at trial.

Commonwealth's Brief at 18. The Commonwealth points to several conversations as instances in which Byrd and his visitors "actually intimated that they knew they were being recorded:"[10] (1) Byrd telling his fiancée, Dana Heaps, he could not communicate the way he wanted to because of the prison setting;[11] (2) Byrd talking at normal volume and then moving to whispered tones in certain conversations;[12] (3) Byrd telling Heaps, "I swear to God, and – and – I'm gonna say it on the phone, I don't give a fuck;"[13] and (4) Heaps having to repeat herself during one visit because she spoke before the

_____

[10] Commonwealth's Brief at 18.

[11] N.T., 10/31/2016, at 23.

[12] Id. at 24.

[13] Id. at 24.

recorded message played regarding the recording and monitoring of prison phone calls.[14]   Id. at 18–20.   Relying on Commonwealth v. Baumhammers, 960 A.2d 59 (Pa. 2008), cert. denied, 558 U.S. 821 (2009),[15] the Commonwealth states:

> These conversations indicate actual acknowledgment that [Byrd] and Ms. Heaps knew they were being recorded during the visits[.]
>
> ...
>
> Like the defendant in Baumhammers, supra, [Byrd] and his visitor were notified, prior to beginning their conversations, that each conversation was subject to recording.  Pursuant to the Court's holding in Baumhammers with regard to jail calls, the audio warning heard by [Byrd] and Ms. Heaps prior to the [Allegheny County Jail] visits provided sufficient notice to make all parties actually aware that their conversation was subject to recording.  Moreover, Ms. Heaps testified that she knew she was being recorded and [Byrd]'s behavior and statements demonstrated that he believed that they were being recorded as well.

_____

[14]  Id. at 24-25.

[15]  Baumhammers, supra, held that a recorded jail telephone conversation between the defendant and his parents was permissible under Subsection 5704(14), even where there was no written notification that the conversation would be recorded, because:

> These individuals were actually aware that their telephone conversation was being or could be intercepted and recorded by prison authorities.  Written notice to Appellant, assuming he never received any, would not have afforded him any greater protection of his right to privacy or that of his parents than the actual notice they possessed at the time of the conversation.

Baumhammers, 960 A.2d at 79.

Commonwealth's Brief at 20-21. The Commonwealth concludes "the intercepts were lawful" under the mutual consent exception to the Wiretap Act. Id. at 23.

In suppressing the recordings, the court found the following:

> The evidence presented at the suppression hearing established that inmate visits at the Allegheny County Jail are conducted over a closed-circuit system using telephone receivers. A visitor arriving at the Allegheny County Jail is taken to a visitor room with windowed cubicles, chairs and a telephone receiver. The inmate is escorted to a room on the other side of the visitor window with a telephone receiver below the window. There are no cubicles or walls on the inmate side. The inmate picks up the receiver, enters his or her jail telephone ID number and then the visitor picks up his or her receiver. Before the parties are connected, a recording stating that the visit "may be monitored or recorded" is played. There is nothing in the inmate handbook which indicates that the visits are recorded and there was no testimony regarding whether [Byrd] heard the recording before each visit. Ms. Heaps testified that she heard the recording indicating that the conversation "may be monitored or recorded" at each visit, but received no written documentation indicating that the conversations would be monitored or recorded.
>
> ...
>
> In support of its arguments, the Commonwealth presented the testimony of Ms. Heaps, who testified that she heard a recorded statement stating that the conversation "may be monitored or recorded" prior to the connection of each visit call. Even though Ms. Heaps was never informed of the policy in writing or gave her consent in writing, the Commonwealth presumes that by beginning to speak after the recorded statement, she signified her consent. This Court accepts the Commonwealth's presumption for purposes of this analysis.
>
> Nevertheless, the Commonwealth has failed to present any evidence indicating that [Byrd] heard the recording. It is not outside the realm of possibility that [Byrd] did not have the receiver to his ear when the recording played, and therefore may not have heard it. The Commonwealth conceded that [Byrd] was

not provided with a written statement or agreement regarding consent to be recorded, and similarly conceded that there was no such provision in the inmate handbook.

At the conclusion of the suppression hearing, this Court made the following findings:

THE COURT: But there is no direct evidence of what Mr. Byrd may have known.

[THE COMMONWEALTH]: Well, Mr. [Samuel] Pastor testified that both parties hear this on every visitation. And he's got to have the phone up to his ear when he's punching in – he picks up the phone and he punches in his ID number and it says the call is being processed.

THE COURT: Well, but he doesn't have to have the phone to his ear.

…

THE COURT: Actually the inmates in the Allegheny County Jail are told, as I heard on the recording that you played, may be subject to recording. May be monitored or recorded.

[THE COMMONWEALTH]: I said it's almost identical. What the federal –

THE COURT: There's a big difference between "is" and "may be".

…

THE COURT: The court finds that you have not proven the consent of Mr. Byrd in this case. Relying on the Fant decision, the jail visit conversations will be suppressed.

(S.H.T., pp. 33, 36, 38).

By failing to establish that [Byrd] was aware of the recording and consented to it, the Commonwealth has not satisfied the requirements on two-party consent exception to the Wiretap Act.

Trial Court Opinion, 1/12/2017, at 8, 11-12.

We are constrained to disagree for several reasons. First, we conclude the factual findings made by the trial court are belied by the record. We reiterate that, as the trial court noted: (1) before an inmate and visitor can converse with one another, a recording stating that the visit "may be monitored or recorded" is played;[16] and (2) Heaps acknowledged at the suppression hearing that during every one of her visits with Byrd at the jail, she heard a prerecorded messaged that those visits would be recorded or monitored, and still decided to speak with him. See N.T., 10/31/2016, at 22, 27. Additionally, one can readily infer that Byrd was aware the conversations were being recorded as evidenced by his statements and behavior. For example, he specifically told Heaps, "I'm gonna say it on the phone. I don't give a fuck." Id. at 24. The mutual consent exception permits interception of conversations in instances where the defendant "knew, or should have known, that the conversation was recorded." Commonwealth v. Diego, 119 A.3d 370, 377 (Pa. Super. 2015), appeal denied, 129 A.3d 1240 (Pa. 2015).[17] Based on the environment in which Byrd conversed with Heaps, an open

_____

[16] Trial Court Opinion, 1/12/2017, at 8.

[17] In Diego, supra, the defendant engaged in a text message conversation with the informant, which the Commonwealth sought to admit into evidence. In concluding there was no violation of the Wiretap Act, a panel of this Court stated: "It is the sender's knowledge that the communication will automatically be recorded, surmised from the very nature of the selected means of transmission, that is dispositive of the sender's lack of an expectation of privacy or, at least, the lack of any reasonable expectation of privacy." Diego, 119 A.3d at 377.

visitation area in the jail, he should have known that their conversations could be recorded.

Second, we find the trial court's hyper-technical analysis requires that in these instances, the Commonwealth must always establish on the record that the inmate had the telephone to his ear, listened to the message that announced the conversation may be recorded, and then consented to the message. This type of requirement is unreasonable because under such scrutiny and logic, an inmate could easily avoid the consent element by simply holding the phone away from his ear for a period of time prior to speaking with a visitor, in order to evade hearing that message. As such, the trial court's decision is misplaced with respect to the both its findings of fact and conclusions of law. See Korn, supra. Accordingly, we conclude no Wiretap Act violation occurred as the two-party consent exception applies and, therefore, the trial court erred when it granted suppression on that basis.[18]

In its second issue, the Commonwealth argues the warrantless search of Byrd's vehicle was conducted within the parameters of the newly recognized vehicle exception to the warrant requirement, set forth in Commonwealth v. Gary, 91 A.3d 102 (Pa. 2014), and therefore, the court erred in granting

_____

[18] It bears remarking that the trial court analyzed this issue as it related to the unrelated matter at Docket No. 1818 WDA 2016. In its brief related to the present appeal, the Commonwealth fails to address what prejudice it would incur if these conversations were not admitted with respect to Byrd's gun and drug possession charges.

Byrd's motion to suppress the fruits of the search of his vehicle. Commonwealth's Brief at 25.

Keeping in mind our standard of review regarding suppression motions, we are guided by the following. The Fourth Amendment of the United States Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." U.S. Const. amend. IV. The Pennsylvania Constitution also protects this interest by ensuring, "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures ...." Pa. Const. Art. I, § 8. Moreover, "a lawful search generally extends to the entire area in which the object of the search may be found." Commonwealth v. Rega, 933 A.2d 997, 1013 (Pa. 2007) (citation omitted), cert. denied, 552 U.S. 1316 (2008).

In Gary, supra, the Pennsylvania Supreme Court, in an Opinion Announcing the Judgment of the Court ("OAJC"),[19] "adopt[ed] the federal automobile exception to the warrant requirement, which allows police officers to search a motor vehicle when there is probable cause to do so and does not

_____

[19] While Gary is a plurality decision, the result is precedential due to the nature of Justice Saylor's concurring opinion. Gary, 91 A.3d at 138 ("I join the lead Justices in adopting the federal automobile exception.").

require any exigency beyond the inherent mobility of a motor vehicle." Gary, 91 A.3d at 104.[20] Further, former Justice Seamus McCaffery opined:

> The prerequisite for a warrantless search of a motor vehicle is probable cause to search; no exigency beyond the inherent mobility of a motor vehicle is required. The consistent and firm requirement for probable cause is a strong and sufficient safeguard against illegal searches of motor vehicles, whose inherent mobility and the endless factual circumstances that such mobility engenders constitute a per se exigency allowing police officers to make the determination of probable cause in the first instance in the field.

Id. at 138.

> The Pennsylvania Supreme Court has defined probable cause as follows:
>
> Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the [stop], and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime. The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require only a probability, and not a prima facie showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances test.

Commonwealth v. Martin, 101 A.3d 706, 721 (Pa. 2014) (citation omitted) (emphasis in original), cert. denied, 136 S. Ct. 201 (U.S. 2015).

Turning to the present matter, at the conclusion of the suppression hearing, the trial court made the following findings of fact:

---

[20] Before the Gary decision was announced, "in order for police officers to conduct a lawful search of an automobile without a warrant, the officers were required to have probable cause and exigent circumstances." Commonwealth v. Hudson, 92 A.3d 1235, 1241 (Pa. Super. 2014), appeal denied, 106 A.3d 724 (Pa. 2014).

THE COURT: Okay. The officers were told that [Byrd] had a gun in his possession. They did what they were supposed to. They went out and investigated. They smelled marijuana. [Byrd] was nervous, uncooperative, tried to run, and the officers acted. According to [Byrd]'s constitutional right [sic], the gun was found in plain view.

When [Byrd] was searched, the 44 bags of marijuana, the ten bags of cocaine, the four bags of crack and two something else were on his person and are not suppressed. However, the 20 bags in the lockbox, the vest and the two phones, the suppression is granted.

N.T., 10/31/2016, at 64.

In its Rule 1925(a) opinion, the court further explained:

[A]s this Court noted in its findings at the conclusion of the hearing, the police had been summoned for a call of an individual threatening a woman and in possession of a gun. When Officer Weimer attempt to speak to [Byrd], he acted strangely and then attempted to run away. A gun was found in plain view on the driver's seat. The information given to the police (that [Byrd] had made threats against a woman and had a gun) was sufficient to support the actions taken by the police in removing the [Byrd] from the vehicle (and then finding the gun in plain view), but they did not give rise to any probable cause that would justify their warrantless search of the vehicle. The police did not receive information that [Byrd] was in possession of or selling drugs or conducting any drug activity from his vehicle. The Commonwealth's argument is, essentially, that [Byrd] is a bad guy and that is enough probable cause to justify the search of the vehicle. The officers did not see any drug paraphernalia in plain view and though Officer Weimer detected an odor of marijuana, there was a large amount of marijuana found on [Byrd]'s person when he was eventually subdued. The officers did not observe [Byrd] buying, selling or otherwise transferring drugs to another person. The officers did not observe [Byrd] weighing or packaging drugs for sale. The officers did not see [Byrd] exchanging money with anyone. The officers did not observe [Byrd] engaged in any behavior typically noted in a drug transaction. The totality of the circumstances supported a finding of probable cause for the crimes of terroristic threats and possession of a firearm only, not that drugs were being held and/or sold from the vehicle.

Trial Court Opinion, 1/12/2017, at 6.

The Commonwealth counters the court's findings with the following:

Here, Velez advised Officer Weimer that [Byrd] had threatened to kill her, was parked outside her house and had a gun. Officer Weimer confronted [Byrd], he opened the window and the officer detected a strong odor of marijuana through the open window. [Byrd] was acting nervously, his hands shaking. When asked to exit the vehicle, [Byrd] refused to get out, a struggle ensued and [he] fled, ultimately being apprehended by the police. Officer Krejdovsky observed a gun magazine under a piece of cloth on the front seat of the truck and he lifted the cloth to discover a .40 caliber handgun. Contrary to the conclusion of the [trial] court, the police had probable cause to believe that [Byrd] was in possession of drugs and guns, and therefore, had sufficient information to support the warrantless search of the vehicle pursuant to Gary, supra.

...

In finding Gary inapposite to the instant case, the suppression court focused on the fact that, while the police had been summoned for a call of a woman threatened by a man with a gun, they had not received any information that regarding [Byrd] selling drugs. Further, while acknowledging that the police smelled the odor of marijuana, the court found that the fact that they found marijuana on his person obviated the need for any further research. Similarly, because the police found a gun in plain view, the court concluded that the police could not make any further search of the vehicle. Overlooked by the court is the fact that these facts support the finding and confirmation of probable cause, rather than negate it. The [trial] court was of the opinion that once the officers found evidence that supported the initiation of their search, they were required to stop and get a warrant. The vehicle exception adopted in Gary supports the opposite.

Commonwealth's Brief at 26-27.

Again, we are compelled to disagree with the trial court's conclusion.

The court's analysis is misplaced as it heavily focuses on the drug aspect of

the search, highlighting the following: (1) that the police did not receive information that Byrd was in possession of or selling drugs or conducting any drug activity from his vehicle; (2) the officers did not see any drug paraphernalia in plain view; and (3) Officer Weimer should have stopped his search when he found a large amount of marijuana found on Byrd's person. The police did not have to stop searching once they observed the gun on the front seat as the totality of the circumstances warranted further investigation. Byrd's initial acts established probable cause for the crimes of terroristic threats and possession of a firearm and permitted the officers to continue searching the vehicle for other contraband (i.e., ammunition, knives, other weapons) related to these crimes even though they seized one gun and removed Byrd from the vehicle. See Gary, supra.[21] In fact, the police did seize a bulletproof vest from the back seat of Byrd's vehicle.

Moreover, the officers were permitted to search the unlocked lockbox on the passenger seat of Byrd's vehicle See Wyoming v. Houghton, 526 U.S. 295, 1303-1304 (1999) ("The sensible rule (and the one supported by history and case law) is that...a package [in the car] may be searched, whether or not its owner is present as a passenger or otherwise, because it

---

[21] We note that in Gary, the police detected the smell of marijuana emanating from the defendant's car, which the defendant acknowledged its presence. The defendant was placed in the back of the police cruiser. He attempted to flee but was captured. Police subsequently discovered two pounds of marijuana under the front hood of the car. Gary, 91 A.3d at 104-105.

may contain the contraband that the officer has reason to believe is in the car."); see also In re I.M.S., 124 A.3d 311 (Pa. Super. 2015) (holding that Houghton applies in light of the Gary Court's bright line rule), Commonwealth v. Runyan, 160 A.3d 831, 838 (Pa. Super. 2017) (applying I.M.S. and concluding police had "probable cause to believe the vehicle contained contraband, which was all that was necessary to justify the warrantless search of the vehicle, as well as the search of [the defendant]'s purse where the contraband could be concealed."). Accordingly, in applying Gary and its progeny, we conclude the trial court did not properly apply the law to the facts of the case, and therefore, erred in suppressing certain evidence (the 20 bags of heroin, lockbox, vest, and cell phone) retrieved from Byrd's truck.

In sum, we find the trial court erred in suppressing the jail visitation recordings and certain evidence seized from Byrd's vehicle, and we remand this matter to the court for further proceedings.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/26/2018